**Opinion issued December 9, 2014**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-13-01083-CV

_____

**JAE KIM, FANNIN FOOD MART, INC., AND THE REAL PROPERTY KNOWN AS 2111 FANNIN STREET, Appellants**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 270th District Court**
**Harris County, Texas**
**Trial Court Case No. 2012-04769**

---

## OPINION ON REHEARING

The State of Texas brought an action against Jae Kim, Fannin Food Mart, Inc., and The Real Property Known as 2111 Fannin Street (collectively, "the Fannin Parties"), asserting a common nuisance claim. The State obtained a permanent injunction against the Fannin Parties aimed at reducing crime occurring

on and around the property. In six issues, the Fannin Parties assert (1) the evidence is legally and factually insufficient to support the final judgment, (2) certain provisions of the relevant statutes are unconstitutional, (3) the financial burdens of the final judgment were excessive, (4) the State's expert testimony was unreliable and subjective, (5) the in-rem injunctive relief imposed against the real property was improper, and (6) the State selectively applied the relevant statutes in an unconstitutional manner against the Fannin Parties.

On October 9, 2014, we issued our original opinion in this case. On November 7, 2014, the State filed a motion for rehearing. We deny the motion for rehearing, withdraw our prior opinion and judgment, and issue this opinion and a new judgment in their place. Our disposition remains the same.

We reverse and render.

## Background

The property at issue, 2111 Fannin Street, is south of downtown Houston, Texas. Kim is the owner of the property. The property is a commercial property, containing a donut shop, a car repair shop, a dry cleaning business, a convenience store and gas station, and an unoccupied space. Fannin Food Mart runs the convenience store and gas station on the property. It is the only business on the property that is open 24 hours a day.

Officer Wall works in the Forfeiture Abatement Support Team of the Houston Police Department. As part of his duties, he investigates properties that experience high frequency or habitual crimes. When a location is referred to him, Officer Wall begins an investigation of the property. He determines how many calls for service have been received for specific types of crimes occurring on or near that property. He then creates a report identifying the qualifying calls for service, excluding calls received from owners or operators on that property.

As part of his investigation, Officer Wall goes to the property and performs a physical inspection, looking for security concerns. He then talks with an owner or operator on the property about how to correct those security concerns. His advice on correcting security concerns covers landscaping, lighting, the layout of the inside and outside of the building, camera placement, panic alarms, no trespassing affidavits, no trespassing signs, video surveillance signs, and hiring of off-duty police officers to patrol the property.

Some time before January 25, 2012—the date that the original petition was filed in the underlying suit—someone referred the 2111 Fannin Street property to Officer Wall. He conducted an investigation. He looked at the number of pertinent offenses that received service calls, starting from July 2011. By the time of the bench trial—August 12, 2013—34 pertinent offenses had been reported to the police. Nine of those occurred before he conducted an initial inspection of the

3

property early in the investigation. Fourteen more offenses occurred between the initial investigation and the entry of an agreed temporary injunction after suit had been filed. Twenty offenses occurred between the time of the temporary injunction and the time of the bench trial.

When he conducted a physical inspection of the property and talked to one of the property operators early in his investigation, Officer Wall spoke with Sonny Lalani, an assistance manager at 2111 Fannin Food Mart. During the conversation, Officer Wall recommended to Lalani a number of changes intended to abate the criminal activity. Those recommendations included always using their drop safe, fixing the panic alarm, increasing the number of security cameras, increasing lighting, cutting back or removing bushes that blocked visibility, and hiring an off-duty police officer to patrol the premises. Officer Wall testified that the Fannin Parties complied with most of his recommendations, including fixing the panic alarm, increasing the number of security cameras, increasing the lighting, and removing a number of bushes on the property.

Officer Wall also testified that, at the time of his investigation, there was a car wash on the premises that was no longer in use. He testified that the car wash created a hazard by blocking the view of parts of the property and that a number of "vagrants" and "dope" sellers hung around it. He acknowledged that, upon his request, the Fannin Parties paid to have the car wash demolished. Officer Wall

4

testified that all of these actions were "reasonable." He also testified, however, that they did not sufficiently abate the criminal activity. He identified certain "dead spots" on the property that even the recent, additional security cameras did not cover. He also testified that the most important measure that needed to be taken was hiring off-duty police officers to patrol the premises.

Lalani testified that, at the time Officer Wall first came to the premises during the investigation, they had 12 security cameras on the entire property. All of the security cameras could be viewed by clerks inside 2111 Fannin Food Mart. After Officer Wall talked to him about the security concerns, the Fannin Parties added an additional 12 security cameras. He testified that, at some time before trial, they added four more security cameras to cover the blind spots that Officer Wall had testified about.

Officer Wall had asked them to never sell individual cigarettes, Brillo pads, and glass pipes. Lalani testified that they had never sold individual cigarettes or glass pipes. They had sold Brillo pads but stopped selling them after Officer Wall asked them to stop.

Lalani explained that if anyone is creating a disturbance on the property, that person is asked to leave. If the person does not leave, they call the police. He testified that, in January 2012, they hired an additional employee to patrol the area and pick up litter. At the time of the trial, they also employed a security officer

5

(who is not an off-duty police officer).  The security officer works from 4:00 p.m. to midnight, Monday through Friday.

Oliver Griebl, the property manager for the 2111 Fannin Street property, testified that the four additional security cameras installed to cover the remaining blind spots were high definition cameras and could be accessed remotely, not only on the property.  He testified that, before they hired the security officer, they had hired an off-duty police officer for a period of time.  He explained that they ultimately had to switch to a security officer because the Fannin Parties could not afford the cost of the police officer.  They could hire a security officer for less than half the hourly rate of an off-duty police officer.  Kim also testified and confirmed that the Fannin Parties could not afford the cost of the off-duty police officer and that is why they hired a security officer instead.

After the bench trial, the trial court issued a permanent injunction as part of the final judgment.  After an amendment, the final judgment required the Fannin Parties to hire two security guards or security officers to patrol the premises from 8:00 p.m. to "the 'close' of business of Fannin Food Mart, Inc."; to maintain their current level of security cameras; to display signs about the security cameras; to maintain no trespass affidavits; and to refrain from selling single cigarettes, Brillo pads, single glass pipes, and any beverage containing more than 17% alcohol.

## Legal Sufficiency of the Evidence

In part of their second issue, the Fannin Parties argue that the evidence is legally insufficient to support the trial court's final judgment.

### A. Standard of Review

In an appeal from a bench trial, the trial court's findings of fact have the same weight as a jury verdict. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994); *Nguyen v. Yovan*, 317 S.W.3d 261, 269–70 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). We review a trial court's findings of fact under the same legal sufficiency of the evidence standards used when determining whether sufficient evidence exists to support an answer to a jury question. *Catalina*, 881 S.W.2d at 297; *Nguyen*, 317 S.W.3d at 270.

A governmental entity has the authority to place limitations on property rights through nuisance claims. *Severance v. Patterson*, 370 S.W.3d 705, 710 (Tex. 2012). Such action constitutes an exercise of police power. *Id.* Whether an action is a valid effort to abate a public nuisance and whether the action constitutes a taking are two sides of the same coin. *See City of Dallas v. Stewart*, 361 S.W.3d 562, 569, 574 (Tex. 2012) (holding "[n]uisance determinations are typically dispositive in takings cases" and "[t]he nuisance determination . . . gives the government authority to take and destroy a person's property without compensation"). If a governmental entity reasonably abates a public nuisance, that

action does not constitute a taking. *Noell v. City of Carrollton*, 431 S.W.3d 682, 695 (Tex. App.—Dallas 2014, pet. filed) (citing *Stewart*, 361 S.W.3d at 569). "But a [governmental entity] may not, under the guise of the police power, arbitrarily interfere with private property or impose unusual or unnecessary regulations on it." *Id.*

A nuisance determination is constitutional in nature. *Stewart*, 361 S.W.3d at 575. "Because a nuisance determination is an exercise of the police power, it, like any other determination regarding the police power, 'is a question of law and not fact' that must be answered based upon a 'fact-sensitive test of reasonableness.'" *Id.* at 575–76 (quoting *City of Coll. Station v. Turtle Rock Corp.*, 680 S.W.2d 802, 804 (Tex. 1984)).

For takings cases, the determination of whether a governmental entity has committed a taking is a question of law. *City of Austin v. Travis Cnty. Landfill Co., L.L.C.*, 73 S.W.3d 234, 241 (Tex. 2002). "While we depend on the fact-finder 'to resolve disputed facts regarding the extent of the governmental intrusion,' the ultimate issue of whether the facts constitute a taking is a question of law." *Id.* (quoting *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 933 (Tex. 1998)). We review questions of law de novo. *See Stewart*, 361 S.W.3d at 576. Because of the interrelated nature of nuisance determinations and takings determinations, we hold that the same principles of appellate review apply to a trial court's ruling on public

8

nuisance claims. Accordingly, we will review de novo whether the facts establish a public nuisance. *Cf. City of Austin*, 73 S.W.3d at 241.

**B.    Analysis**

Under chapter 125 of the Texas Civil Practice and Remedies Code, an individual or a governmental entity may bring an action to abate certain types of criminal activity that occur repeatedly at a given location. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 125.0015 (Vernon Supp. 2014), § 125.002 (Vernon 2011). The party bringing the action must establish that the opposing party (1) maintains a place to which persons habitually go for the purposes of committing certain enumerated crimes; (2) knowingly tolerates the activity; and (3) "fails to make reasonable attempts to abate the activity." *Id.* § 125.0015(a). The Fannin Parties challenge the legal sufficiency of each element of the claim. Because we conclude it is dispositive, we turn to the third element.

The Fannin Parties "maintain[] a common nuisance" only if they have "fail[ed] to make reasonable attempts to abate the" criminal activity occurring on their property. *See id.* The State relied on a time span of just over two years to establish that the Fannin Parties were maintaining a common nuisance. All parties agreed, however, that the Fannin Parties made numerous reasonable attempts to abate the criminal activity in this time period.

Officer Wall recommended that the Fannin Parties always use their drop safe in the convenience store, fix the panic alarm, increase the number of security cameras, increase the lighting, cut back or remove bushes that blocked visibility, hire an off-duty police officer to patrol the premises, and demolish the car wash. Officer Wall testified that the Fannin Parties complied with most of his recommendations, including fixing the panic alarm, increasing the number of security cameras (doubling from 12 to 24),[1] increasing the lighting, removing a number of bushes on the property, and demolishing the car wash. The Fannin Parties testified that they took these actions, among others. All of the witnesses at trial agreed that, while they had not hired an off-duty police officer to patrol the premises, the Fannin Parties had hired a security guard to patrol the premises for certain times. Accordingly, all of this evidence is undisputed. "[U]ndisputed evidence that allows of only one logical inference" cannot be disregarded by the trier of fact, and the trier of fact cannot "reach a verdict contrary to such evidence." *City of Keller v. Wilson*, 168 S.W.3d 802, 814 (Tex. 2005).

---

[1] All of the witnesses at trial agreed that the Fannin Parties doubled the number of security cameras on the property. Only the Fannin Parties' witnesses testified about the four additional, high-definition cameras. The outcome of this case is not affected by the inclusion or exclusion of this evidence. We do not need to determine, then, whether the trial court's judgment implicitly rejected their existence or whether we need to defer to such a determination. *See City of Austin v. Travis Cnty. Landfill Co., L.L.C.*, 73 S.W.3d 234, 241 (Tex. 2002) (holding appellate courts depend on fact-finder to resolve disputed facts). Accordingly, for the purposes of our analysis, we do not consider the four additional security cameras.

For each of these actions that Officer Wall was questioned about, he agreed that the actions were reasonable. There was no evidence presented at trial showing these attempts were not reasonable. This establishes the opposite of the burden carried by the State to show that the Fannin Parties failed to make reasonable attempts to abate the criminal activity. *See* CIV. PRAC. & REM. § 125.0015(a) (providing common nuisance is maintained when party fails to make reasonable attempts to abate criminal activity). Accordingly, the legal sufficiency challenge must be sustained.

The State argues the evidence is legally sufficient to support the judgment because the evidence at trial established that, despite the Fannin Parties' interim efforts, criminal activity continued on their property as of the time of the trial. They also rely on Officer Wall's testimony that hiring an off-duty police officer to patrol the premises was the most important action they needed to take to abate criminal activity. These arguments, however, ignore the language of the statute establishing the State's burden of proof. A party maintains a common nuisance only if it "fails to make reasonable *attempts* to abate the [criminal] activity." *Id.* (emphasis added). The plain language of the statute places the focus of the inquiry on what efforts the defending parties took, as opposed to the ultimate success or failure of those attempts.

Indeed, the word "attempt" includes in its definition the possibility that the effort might fail completely. *See* THE NEW OXFORD AMERICAN DICTIONARY 101 (2d ed. 2005) (defining noun form of "attempt" as "an act of trying to achieve something, typically one that is unsuccessful or not certain to succeed"). Similarly, "abate" commonly means to lessen but not necessarily to completely end. *See id.* at 2 (defining legal term "abate" as "lessen, reduce, or remove"). The statute required the Fannin Parties only to try to lessen the criminal activity on their property. We cannot, then, conclude that the State carried its burden by showing that the Fannin Parties' actions did not succeed in abating all of the criminal activity. As long as the attempts were *reasonable* attempts to abate the criminal activity—and all parties agreed that they were—then the State has not carried its burden to establish a common nuisance. *See* CIV. PRAC. & REM. § 125.0015(a).

Nor do we find any statutory support for the argument that, because there were further attempts that the Fannin Parties could have made that would also be reasonable, the State carried its burden of showing that the Fannin Parties failed to make reasonable attempts. The State argues in its motion for rehearing that it presented a fact issue to be resolved by the trial court on whether the Fannin Parties' actions were reasonable because "Officer Wall testified that '[t]he placement of uniform[ed] police officers patrolling the property exclusively on that property during the business hours of the convenience' store is the most important

12

measure that needs to be taken . . . to reduce the crime that is occurring there." We disagree that this testimony created a fact issue on whether the other attempts were reasonable.

The undisputed evidence establishes that the Fannin Parties performed a number of actions that Officer Wall identified as important to abate criminal activity. Officer Wall testified in detail about why those other actions were important for abating criminal activity. The fact that he considered hiring off-duty police officers to be "the most important measure" does not contradict or otherwise undermine the fact that the other actions were reasonable attempts to abate criminal activity. Accordingly, the only permissible inference from the evidence in the record was that the Fannin Parties attempted to abate the criminal activity and that the attempts were reasonable.[2] *See City of Keller*, 168 S.W.3d at 814 (holding undisputed evidence that allows only one logical inference cannot be disregarded by the trier of fact).

---

[2] The State also argues in its motion for rehearing that reasonableness is ordinarily a question of fact. *See Fisch v. Transcon. Ins. Co.*, 356 S.W.2d 186, 192 (Tex. Civ. App.—Houston [1st Dist.] 1962, writ ref'd n.r.e.) ("Ordinarily what is 'reasonable' is a question of fact."). Even assuming it was within the trial court's discretion to disregard all of the undisputed evidence showing the reasonableness of the Fannin Parties' actions, however, disbelieving some evidence does not, in itself, prove its opposite. *See Lozano v. Lozano*, 52 S.W.3d 141, 150 (Tex. 2001). The State bore the burden to prove either that the Fannin Parties failed to attempt to abate the criminal activity or that the attempts taken were not reasonable. As we have held, the record shows that the State has not carried this burden.

We are sympathetic to the limitations this places on the efforts of governmental entities to reduce crimes in areas where they are repeatedly committed. Nevertheless, we cannot construe a statute in a way that contradicts the plain meaning of the words used. *See State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006) (holding courts are required to apply words of statute according to their common meaning without resort to rules of construction or extrinsic aids when statute is clear and unambiguous). Nor does the United States Constitution permit governmental entities to "arbitrarily interfere with private property or impose unusual or unnecessary regulations on it." *Noell*, 431 S.W.3d at 695.

We hold the evidence is legally insufficient to sustain the trial court's judgment. We sustain this portion of the Fannin Parties' second issue. Because the Fannin Parties' remaining issues would not provide them with greater relief, we do not need to reach them. *See* TEX. R. APP. P. 47.1.

## Conclusion

We reverse the trial court's judgment and render a take-nothing judgment against the State of Texas.

Laura Carter Higley
Justice

Panel consists of Justices Higley, Bland, and Sharp.

14